IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | |
| | : | Case No. 1:10-CR-131 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| Adam Beetz, | : | DEFENDANT'S MOTION TO |
| | : | SUPPRESS EVIDENCE |
| Defendant. | : | |

This matter comes before the Court on Defendant Adam Beetz's Motion to Suppress Invalid Search Warrants, Evidence Seized Pursuant to Invalid Search Warrants, and Alleged Oral Statements by Defendant.  (Doc. 28.)  The Court held a hearing on Defendant's motion on February 22, 2011.  Following the hearing, Defendant and the Government filed a supplemental motion, response, and reply.  (Docs. 50, 51, 53.)  For the reasons that follow, the Court **DENIES** Defendant's Motion to Suppress.

I.      **FACTUAL BACKGROUND**

Defendant Beetz is charged in this action with conspiracy to distribute and possess with intent to distribute marijuana (Count 1); possession with intent to distribute marijuana (Count 2); establishment of distribution operations (Count 3); interstate travel to promote a narcotics conspiracy (Count 4); and possessing a firearm in furtherance of a drug trafficking crime (Count 5).  His arrest on those charges stems from the arrest of a police officer, Hamilton County

Special Deputy Sheriff Jason Drengler, who was allegedly transporting marijuana from California to Ohio for Defendant Beetz.

On August 24, 2009, while conducting a drug-related investigation of a Chicago-bound Amtrak train that originated in California and stopped in Reno, Nevada, officers from the Reno Police Department discovered that Drengler was traveling with a suitcase full of marijuana.[1] (Doc. 30 at 243, 247; Tr. 31:19-24.[2])  The Reno officers arrested Drengler and questioned him about the contents of his suitcase.  (Doc. 30 at 247-48.)  Drengler initially feigned shock, but after about forty-five minutes, he finally told the officers that he was serving as a courier for Adam Beetz and his brother, both of whom had been involved in the sale of marijuana for an extended period of time.  (Doc. 30 at 242-43; Tr. 36:1-7.)  Drengler told to Reno officers that it was only his second time acting as a courier and that Beetz was going to pay him $1,000.00 for transporting the marijuana back to Cincinnati, Ohio, where Beetz planned to sell the drugs. (Doc. 30 at 243; Tr. 32:4-9.)  Drengler then indicated that he would be willing to participate in a controlled delivery.  (Doc. 30 at 243.)  Accordingly, Reno Police Officer Joe Lever contacted Sergeant Kevin Koo of the Hamilton County, Ohio Sheriff's Office Regional Narcotics Unit (RENU) and arranged to transport Drengler and ship the marijuana to Cincinnati.  (*Id*. at 243, 249; Tr. 35:11-21.)

Drengler arrived in Cincinnati late on August 25, 2009.  At approximately 11:58 p.m. that night, RENU Agents Koo and Timothy Nash interviewed Drengler.  (Doc. 30 at 249.) During that interview, Drengler allegedly told Sergeant Koo that on two occasions in 2006 and

---

[1] The suitcase contained approximately twenty pounds of marijuana, which was divided into one-pound quantities, wrapped in plastic, and vacuum sealed.  (Tr. 32:22-33:7, 39:7-12.)

[2] The Supression Hearing Transcript is filed at CM/ECF Doc. 47.

2007, he had driven to Chicago to meet Beetz at the train station and drive him back to Cincinnati. (*Id*.) On each occasion, Beetz had a black duffel bag with him. (*Id*.) Drengler made a third trip to Chicago sometime near the end of 2007 to pick up another individual for Beetz. (*Id*.) That individual had in his possession a carry-on bag and a small green or brown duffel bag. (*Id*.) Drengler said he never saw any marijuana, but suspected something was not right. (*Id*.) Beetz paid Drengler $500.00 for each trip. (*Id*.) Drengler then described a fourth trip that took place in 2008. On that trip, Beetz and Drengler drove together to Chicago, flew to San Francisco, and then took a train back to Chicago after a couple of days. (*Id*. at 249-50.) Once again, Beetz had a black duffel bag with him. (*Id*. at 250.) On that occasion, Drengler could smell the odor of marijuana in the bag. (*Id*.) Beetz paid Drengler $1,200.00 for traveling with him. (*Id*.)

Drengler then described the latest trip. He claimed that on August 17, 2009, Beetz approached him about making another trip to San Francisco "just like the last time," which Drengler interpreted to mean that he was to assist Beetz in transporting marijuana back to Cincinnati, Ohio. (Doc. 30 at 250.) Drengler agreed, and on August 22, 2009, he drove to Chicago and flew to San Francisco. (*Id*.; Tr. 110:14-111:2.) When he arrived in San Francisco, he met Beetz and another man who he believed was Beetz's brother. (Doc. 30 at 250.) Beetz and the other man drove Drengler to a Motel 6 and gave him a black suitcase. (*Id*.) Beetz then took Drengler to a train station in Sacramento, where he boarded a train to Chicago. (*Id*.) As described above, Drengler was intercepted and arrested by officers in Reno, Nevada.

Over the course of that night and the following day, RENU agents, working under the direction of Lieutenant Brad Winall, conducted an investigation into Beetz's activities. On the

3

morning of August 26, 2009, Lieutenant Winall assigned Agent Steve Lawson to draft an affidavit for a search warrant application to be submitted later that day. (Tr. 19:17-25.) Lieutenant Winall and Sergeant Koo informed Agent Lawson of the events that had transpired. (*Id*. at 20:7-24.) In addition to the information described above, Agent Lawson learned that Drengler had made a series of monitored phone calls and that Lieutenant Winall's plan was to conduct a controlled delivery of the marijuana just as it would have taken place had police officers not intercepted Drengler in Reno. (*Id*. at 21:1-12.) Throughout the course of that day, as Agent Lawson worked on the affidavit, he gathered additional information from Drengler, Sergeant Koo, and other sources. (*Id*. at 21:15-22:22.)

As the day progressed, the agents decided to seek warrants for two residences. (*Id*. at 23:7-9.) The first residence, condominium unit 1808 at 2200 Victory Parkway, was believed to be Beetz's current address. (*Id*. at 23:10-17.) Drengler had provided specific identifying information about that location, and Agent Lawson confirmed that Beetz had an active utility account at that address. (*Id*. at 23:18-24:23.) Drengler stated that he had been in Beetz's Victory Parkway residence about ten times during the past two years. (*Id*. at 166:11-25.) During those visits, he observed firearms, body armor, currency, and a safe. (*Id*. at 167:1-4.) He did not mention ever having seen marijuana in the apartment. Nor did he claim to have previously delivered any marijuana to that location. (*Id*. at 167:12-168:8.)

The second residence was located at 1238 Elsinore Avenue.[3] (*Id*. at 26:20-25.) The second residence was to be the location of the controlled delivery. (*Id*. at 27:6-13.) Beetz had

---

[3] The parties sometimes refer to this street as "Elsinore Avenue" and sometimes as "Elsinore Place." Throughout this Order, the Court refers to the street as Elsinore Avenue, because that is how the street is referred to in the challenged search warrant and corresponding affidavit.

4

taken Drengler to that location several days prior to the trip to California. (*Id*. at 33:15-24, 108:5-20.) While showing Drengler the residence, Beetz had indicated that he planned to move into the house at some point and that Drengler was to deliver the marijuana to that location. (*Id*. at 34:5-10.) When Drengler first saw the residence on that occasion, it was still bare, and it did not appear that Beetz had moved any personal belongings into the house. (*Id*. at 115:5-12.) On August 26, 2009, the RENU agents learned through speaking with Drengler and having Drengler place at least one monitored phone call to Beetz that Beetz planned to meet Drengler at the Elsinore Avenue residence. (*Id*. at 27:16-25.) Accordingly, Lieutenant Winall sent a surveillance team to monitor the house. The team observed Beetz's BMW parked in front of 1238 Elsinore Avenue on August 26, 2009. (*Id*. at 37:21-38:13.)

Based in part on that information, Agent Lawson drafted two affidavits, one for each residence. (*See* Gov't Exs. 1, 2.) Each affidavit is about six pages in length. They include detailed descriptions of the places to be searched and the items expected to be found within, and they similarly describe the evidence and information gathered during the investigation into Beetz's alleged criminal activity. (*Id*.) The Victory Parkway affidavit contains the following information pertinent to Agent Lawson's belief that the warrant request was supported by probable cause:[4]

> The affiant has been a member of the Cincinnati Police Department for 10 years with training and experience in drug investigations. Your affiant has received over 100 hours of formal classroom training specifically in narcotics investigations. Your affiant has been assigned to investigate both drug traffickers as well as drug abusers while assigned to the violent crimes task force. Your affiant has been assigned to the Regional Narcotics Unit for over 6 years as a

---

[4] The following excerpt and all subsequent excerpts of the affidavits at issue are quoted without any alteration of punctuation, grammar, or spelling.

narcotics investigator.  In addition to the investigation of hundreds of local traffickers, your affiant has successfully conducted investigations involving drug trafficking organizations located in Texas, California, Arizona, and Chicago that were responsible for the large scale distribution of narcotics into the greater Cincinnati area.  These investigations conducted by your affiant were successfully prosecuted in both state and federal court.

On August 24th, 2009, Agents of the Regional Narcotics Unit (RENU) were contacted by members of the Reno, Nevada Police Department Narcotics Unit that investigators arrested an individual in possession of approximately 21 pounds of marijuana at Amtrak Train Station in Reno, Nevada.  The arrested subject agreed to cooperate regarding the destination of the marijuana as well as other the individuals involved in the transport and distribution of marijuana.  The subject, herein afer referred to as RCI09-44, stated that the marijuana was intended to be delivered to Cincinnati.  The RCI09-44 stated that he/she left Cincinnati several days earlier and traveled to Chicago O'Hare International Airport.  From there, the RCI09-44 traveled by plane to San Francisco, California where he/she met an individual identified as Adam BEETZ (CTL#2650388).  BEETZ and RCI09-44 traveled by car from San Francisco to Sacramento where, BEETZ provided RCI09-44 with a black suitcase containing the marijuana.  With BEETZ remaining in California, RCI09-44 traveled to RENO via Amtrak in possession of the marijuana where RCI09-44 was arrested and the marijuana seized.

In addition to providing details of the interview of RCI09-44, RENO investigators stated that RCI09-44 made consensually monitored phone calls to BEETZ after being arrested.  During the calls BEETZ stated that BEETZ was still in California and was looking for "drones" with BEETZ's brother.  RCI09-44 asked BEETZ to explain what a "drone" was.  BEETZ explained that a "drone" was a baby plant that he and BEETZ'S brother used to grow into larger plants.  RCI09-44 ended the conversation by stating everything was going as planned.

Both Law Enforcement agencies agreed that in order to complete the investigation, RCI09-44 would travel to Cincinnati to meet with RENU Agents and the marijuana would be transferred into the custody of Regional Narcotics Unit.  During the morning hours of August 26th, 2009, RCI09-44 traveled to Cincinnati where he/she met by RENU Agents for debriefing and processing and the seized marijuana was transferred into the custody of the Regional Narcotics Unit.

During the debriefing by RENU Agents, RCI09-44 confirmed the statement made by RCI09-44 to RENO investigators regarding the marijuana and BEETZ.  In addition to the previously mentioned information, RCI09-44 provided additional information regarding BEETZ and RCI09-44's historical involvement with BEETZ.  RCI09-44 stated that he/she has known BEETZ for approximately 8

6

years and has not ever known BEETZ to have any gainful employment other than selling marijuana.  RCI09-44 stated that he/she has assisted BEETZ on four other occasions with the transport of marijuana.  On one occasion, approximately three years ago, RCI09-44 traveled with BEETZ from Cincinnati to California and transported a large bag of marijuana back to Cincinnati.  Since that time, RCI09-44 has driven to Chicago to pick up BEETZ, who was in possession of a large amount of marijuana each time, on three separate occasions.  Although BEETZ was in California all August 24th, 2009, RCI09-44 stated that BEETZ only traveled there to facilitate the delivery and actually lived in Cincinnati.

RCI09-44 identified BEETZ'S residence as 2200 Victory Parkway, #1808.  The building was described as a large high-rise building comprised of apartment style condominiums.  RCI09-44 described the building as being well maintained with 24 hour security and a saloon/spa and restaurant on the first floor.  RCI09-44 described the condominium in detail and also provided a hand sketched map of the floor plan.  The entry door was described as being wooden with black numbers identifying #1808.  RCI09-44 stated that there was an additional door to enter and exit the residence from located in the same hallway but BEETZ utilized the door with the #1808 as the primary entrance and exit.  RCI09-44 stated that BEETZ has lived at this location for the past couple of years.  RCI09-44 has been inside of the residence approximately 10 times in the past two years.  While inside, RCI09-44 has observed numerous firearms, ballistic body armor, large amounts of U.S. Currency and a safe.  RCI09-44  described BEETZ'S favorite firearm as a .45 caliber handgun.  BEETZ is said to always have this firearm on his person or located within the middle console of his 2006 Black BMW.  Within the past 2 weeks, RCI09-44 states that he/she met with BEETZ in the building on Victory Parkway and had a conversation about going out to meet some friends but BEETZ declined stating that he was staying home.  RCI09-44 stated that BEETZ walked in the direction to return to #1808.

On August 26, 2009, your affiant learned through departmental resources that Adam BEETZ (last four of SSN#[----]) has current utility accounts at 2200 Victory Parkway #1808 and #1804.  Based upon the location of both residences within the building and the statement provided by RCI09-44, your affiant believes that both doors access the same residence, #1808.  Furthermore, the building is identified as the "Edgecliff, a multi-unit residential condominium building that has the same amenities as previously stated by RCI09-44.

RCI09-44 described a meeting that took place with BEETZ on or about August 21st, 2009.  RCI09-44 stated that during a cellular phone conversation, BEETZ directed him/her to come to a house located at 1238 Elsinore Ave in Cincinnati to meet BEETZ.  Upon arrival, BEETZ, who was already there, let RCI09-44 inside and took him/her on a tour of the residence.  Prior to entering, RCI09-44 observed BEETZ'S black BMW parked in front or the residence.  BEETZ stated that this

was going to be BEETZ'S new residence.  RCI09-44 described the house as being newly built with no furniture or personal belongings anywhere within the building.  RCI09-44 stated that the house was completely bare and in fact there were workers at the house discussing with BEETZ how BEETZ wanted the house wired for surround sound.  Based upon BEETZ'S statements and RCI09-44's observations, RCI09-44 concluded that BEETZ had yet to take occupancy of the residence but did have control/access to 1238 Elsinore Avenue.

On that same date, while inside the house, BEETZ discussed RC109-44 going to Sacramento the next day with BEETZ where they would see BEETZ'S brother and RCI09-44 would transport marijuana back for BEETZ.  BEETZ stated that he would pay RCI09-44 $1,000.00 to $1,500.00 dollars for going on the trip.  BEETZ stated that the marijuana would be delivered to the house on Elsinore upon arrival.  RCI09-44 agreed to the terms of the transaction and the meeting was terminated.

As this information was learned during the debriefing on August 26th, surveillance team members observed a black BMW bearing OH/ EVZ3773 parked in front of 1238 Elsinore Avenue.  A computer check revealed the vehicle to be registered to Adam BEETZ at 2510 Gibbs Road in Goshen, Ohio.  This corroborates the information provided by RCI09-44 regarding the Black BMW owned and consistently operated by BEETZ.

A short time later, during the ongoing debriefing of RCI09-44, he/she provided the following numbers used to communicate with BEETZ during the transport of marijuana; (707) 472-8946 and (513) 748-3939, both numbers assigned to the Verizon cellular phone carrier.  RCI09-44 agreed to make monitored and recorded phone calls to BEETZ to further discuss the delivery of marijuana that is scheduled to take place during the evening on August 26th, 2009.  During the calls, RCI09-44 asks BEETZ how well the items are packaged because RCI09-44 believes that an odor is emitting from the suitcase.  BEETZ states that the items are "triple-sealed" and therefore no odor can escape.  BEETZ refers to prior trips where he, himself has become paranoid of odor emitting for without justification.  RCI09-44 also states that he/she cannot remember exactly how to get the location on Elsinore to make the delivery.  BEETZ advises RCI09-44 to call BEETZ when he/she is close and BEETZ will direct him/her to the location to make the delivery.

Examination of the marijuana recovered from RCI09-44 during the investigation revealed that the marijuana was packaged in food saver sealed bags, in 1 pound quantities (approximately).  It is your affiant's experience that this type of packaging is commonly used by drug trafficking organizations to package marijuana for transport due to the strong odor that is able to escape traditional plastic packaging materials.  With food saver bags, a machine is commonly used

with the appropriate sealer bags (legitimately used in the storage of meats and other foods), which when used properly creates a virtual air tight seal. Organizations have found this method of packaging to be successful and therefore routinely continue to use this method to ship both narcotics and monies derived from the sale of narcotics to avoid detection from Law Enforcement. An additional fact of interest regarding the packaging is that during a recorded conversation BEETZ assures RCI09-44 that the items being transported are "triple-sealed". It is your affiant's belief based upon the totality of the above listed facts, BEETZ was referring to the packaging technique when reassuring RCI09-44 during the recorded conversation.

Your affiant has investigated hundreds or narcotic traffickers and has been involved in the service of many dozen search warrants of residences. As a result, your affiant knows that narcotics traffickers maintain contraband, currency, keys, documents and paraphernalia, communication devices and additional items listed in this search warrant on their persons, in the vehicles they consistently operate, use to travel to conduct said transactions and carryout out acts that facilitate said criminal activity. In addition, your affiant knows that traffickers commonly utilize associates to obtain assets and acquire locations to conceal their identity and while facilitating criminal activities. Given the totality of the above listed facts, your affiant believes that BEETZ is engaging such a pattern of activity with not only the address listed in this warrant, but recovering evidence listed in this warrant will assist law enforcement in obtaining additional evidence to further the investigation against BEETZ but also disrupt the distribution of dangerous narcotics into the community.

(Gov't Ex. 1 at 2-6.)

The Elsinore Avenue affidavit contains substantially the same information with the

following additional operative paragraphs:

During the evening hours August 26th, 2009, additional conversations were monitored and recorded between BEETZ and RCI09-44 discussing the delivery of the marijuana at 1238 Elsinore Avenue. It was agreed by both parties that RCI09-44 would deliver the marijuana to BEETZ inside of the residence.

While under RENU surveillance and equipped with audio recording and monitoring devices, RCI09-44 entered 1238 Elsinore in possession of the marijuana. While inside the residence, BEETZ took possession of the marijuana from RCI09-44. BEETZ provided RCI09-44 with the previously agreed upon U.S. Currency for completing the delivery. Upon completion of the transaction, RCI09-44 exited the residence under surveillance walked a short distance before meeting with RENU Agents.

9

(Gov't Ex. 2 at 5.)

When asked about how he obtained all of the information included in the affidavits, Agent Lawson explained that he listened to at least one of the monitored phone calls, that he spoke with Sergeant Koo and Drengler throughout the day about the ongoing investigation, and that he did some independent research. (Tr. 106:11-108:4.)  Agent Lawson based the description of the controlled delivery that he included in the Elsinore Avenue affidavit on information he got from Lieutenant Winall regarding the operational plan. (*Id*. at 25:15-21, 30:2-7.)  He testified that he is fairly confident that after he drafted that portion of the affidavit, he either read it or summarized it to Lieutenant Winall. (*Id*. at 40:6-16.)  In either case, the evidence suggests the officers were on the same page as far as how they expected the controlled delivery to take place. Although Agent Lawson wrote the description of the controlled delivery before it actually happened, he maintains that he did not swear to the truth of the affidavit until after Lieutenant Winall informed him that the delivery had taken place. (*Id*. at 40:3-5.)

Agent Lawson completed the affidavits sometime during the evening of August 26, 2009. He then contacted the Clerk's Office at the Hamilton County Justice Center and requested assistance in contacting a Judge to review the warrant application. (*Id*. at 41:9-17.)  According to Agent Lawson, that is the normal procedure officers follow when trying to obtain warrants outside of the court's normal hours of operation. (*Id*.)  The clerk instructed Agent Lawson to come to the Justice Center. (*Id*. at 43:1-24.)  Agent Lawson arrived at the Clerk's Office around 9:30 or 9:45 p.m., and an employee of the Clerk's Office (hereinafter "the clerk") contacted Judge Heather Russell through a video teleconference system referred to as a "beamer". (*Id*. at 42:13-43:20, 144:21-145:19.)  There is a beamer station at the Justice Center, and Hamilton

10

County Judges can opt to have similar equipment set up in their houses.  (*Id*. at 145:20-146:3.)

Each station consists of a fax machine, a telephone, and a monitor that has video conferencing

capabilities, so that the people who are speaking to each other over the system can see each other

and can transmit documents to each other.  (*Id*. at 41:18-42:10, 147:10-148:12.)  During her

testimony at the suppression hearing, Judge Russell generally described the process of reviewing

a warrant application via beamer as follows: First, the clerk on duty at the Justice Center contacts

Judge Russell, and if she is at home, she tells the clerk to fax the affidavit and warrant to her.

Judge Russell estimated that it takes a minute or two to receive the fax.  If she finds probable

cause to issue the warrant, she uses the phone attached to the beamer to call the clerk's office,

and she tells the clerk to turn on the Justice Center beamer.  Once both stations are turned on, the

Judge should be able to see and speak to the officer requesting the warrant.  (*Id*. at 148:5-22.)  At

that point, Judge Russell places the officer under oath, and she watches the officer sign the

affidavit.  (*Id*. at 148:24-150:25.)  The officer faxes the signed affidavit to Judge Russell.[5]  After

receiving the signed signature page, Judge Russell signs the affidavit and the warrant and then

faxes the papers back to the officer.  (*Id*. at 150:4-18, 151:11-152:3.)  When asked about the

length of time that process takes, Judge Russell stated that although she did not believe the fax

machine was "high speed," she also did not think the process took a long time.  (*Id*. at 150:19-

151:10.)

     In reviewing the Beetz warrant applications, that same general procedure was followed.

Agent Lawson brought the affidavits and unsigned search warrants with him to the Justice

---

     [5] According to Judge Russell, the officer may not always fax the full affidavit, but instead may just fax the signature page.  (Tr. 154:3-12.)

Center.  (*Id*. at 44:1-25.)  Once he had established contact with Judge Russell, he explained to her that he had two affidavits for her to read and two corresponding search warrants.  (*Id*. at 45:1-5.)  He also advised her that he was ready to swear to the truth of the Victory Parkway affidavit, but not to the truth of the Elsinore Avenue affidavit because, he explained, the controlled delivery described in that affidavit had not yet taken place.  (*Id*. at 45:20-47:12.)  He further stated that he would wait until after the controlled delivery was complete before swearing to the truth of that affidavit.  (*Id*. at 45:20-46:15.)  The clerk faxed the unsigned affidavits and warrants to Judge Russell.  (*Id*. at 46:21-23, 56:23-57:9.)  After Judge Russell reviewed the affidavits, Agent Lawson swore to the truth of the Victory Parkway affidavit, signed the affidavit, and then faxed the signed affidavit and accompanying search warrant to Judge Russell for her signature.  (*Id*. at 58:3-60:1; Gov't Ex. 1.)  Judge Russell signed the Victory Parkway affidavit and search warrant at 10:03 p.m., and then faxed the completed warrant and accompanying affidavit back to Agent Lawson.  (*See* Gov't Ex. 1.)  Judge Russell testified that when signing warrants while at home, she generally based her time notations on one of two clocks in her kitchen.  (Tr. 159:18-160:11.)  When asked about the accuracy of the clocks, she responded that she was not sure how to answer that question and that the clocks were just ordinary wall clocks.  (*Id*.)

After authorizing the Victory Parkway affidavit, Judge Russell temporarily broke contact with Agent Lawson while he waited for confirmation of the controlled delivery at the Elsinore Avenue residence.  (Tr. 61:21-62:3.)  In the meantime, Lieutenant Winall and other  RENU agents had been preparing to send Drengler to deliver the marijuana to Beetz.  At the police station, RENU agents fitted Drengler with a wire.  (*Id*. at 174:7-10, 176:15-18.)  The device

consisted of a digital recorder attached to an elastic belt that Drengler wore around his waistband and a microphone that was taped to Drengler's body.  (*Id*. at 177:1-5.)  When turned on, the device made an audio recording and allowed officers to monitor in real time any conversations or other sounds picked up by the device.  (*Id*. at 177:9-17.)  A limited number of RENU agents, including Lieutenant Winall, who was in charge of the operation, and Agent Bernard Erwin, who was responsible for escorting Drengler to the scene, were given monitors.  (*Id*. at 177:15-23, 203:1-10.)

Prior to leaving the police station, Agent Erwin searched Drengler and Drengler's vehicle.  (*Id*. at 175:16-176:2.)  Agent Erwin then placed the suitcase containing the marijuana in the rear cargo area of Drengler's vehicle, and he instructed Drengler to follow him to a location on Eden Park Drive that was about a two to three minute drive from the Elsinore Avenue residence.  (*Id*. at 175:22-176:14, 178:12-14, 187:6-17.)  Meanwhile, Lieutenant Winall and another agent proceeded to Elsinore Avenue and parked close enough to the target residence that they could observe the house.  (*Id*. at 203:20-204:3.)  Another agent, Kyle Ingram, drove around the neighborhood conducting surveillance.  (*Id*. at 204:6-8.)  According to Lieutenant Winall, approximately twenty-five officers were involved in the operation.  (*Id*. at 203:8-10.)

When Agent Erwin and Drengler got to Eden Park Drive, they both pulled over into a parking lot, where Agent Erwin activated Drengler's wire and tested the equipment.  (*Id*. at 176:17-24, 178:12-20.)  During the suppression hearing, Defendant introduced into evidence the surveillance notes of RENU Agent Chris Perry, an officer who was indirectly involved in the controlled delivery.  Agent Perry was stationed in a vehicle near the Elsinore Avenue residence, and was primarily tasked with taking surveillance notes based on information he received from

his radio and from Lieutenant Winall.[6] (*Id.* at 185:9-23.) In his notes, he states that Agent Erwin turned on the Drengler's wire at approximately 10:11 p.m., and he attributes that information to Agent Erwin. (Def. Ex. I.) When asked about those notes, Agent Erwin said that he was not sure of the precise time that he activated the wire. He also stated that the time noted in Agent Perry's notes did not come from him. (Tr. 178:3-179:17, 182:18-23.) Agent Perry testified that as he was writing down the information communicated to him, he also noted the time, which he based on an old watch that was attached to the dashboard of his vehicle. (*Id.* at 185:19-186:7.)

After testing the monitoring equipment, Agent Erwin directed Drengler to proceed to the Elsinore Avenue residence. (*Id.* at 178:16-179:12.) Agent Erwin followed Drengler until he turned onto Elsinore. (*Id.* at 179:18-21.) Other RENU agents were already stationed on the street to continue surveillance. (*Id.* at 179:22-180:1.) Agent Perry's surveillance notes state that at 10:14 p.m., Drengler advised that he was proceeding up Elsinore Avenue to the target residence. (Def. Ex. I.) Shortly thereafter, at approximately 10:15 p.m. according to Agent Perry's notes, Lieutenant Winall saw Drengler pull into the garage of the target residence. (Tr. 206:15-22; Def. Ex. I.) Lieutenant Winall then lost sight of Drengler, but could hear his conversation through the monitor. (Tr. 208:2-20.) After a few minutes, Drengler stated that he was going home, and then he pulled out of Beetz's garage. (*Id.* at 208:18-22.) While backing out of the driveway, Drengler noted to the officers through his wire that Beetz was armed with a .45 caliber weapon. (*Id.* at 208:25-209:1.)

---

[6] Agent Perry did not have a monitor and therefore was not able to listen to the wire transmission. (Tr. 185:15-18.)

Drengler drove a short distance to where Agent Erwin was parked, and then he followed Agent Erwin back to Eden Park Drive where they both pulled over.  (*Id*. at 180:10-20.)  Agent Erwin then deactivated Drengler's wire, debriefed him, searched him, and searched the vehicle.  (*Id*. at 180:22-181:24.)  Agent Erwin testified that although he could tell from listening to the wire transmission that Drengler had delivered the marijuana to Beetz, he nonetheless asked Drengler what had happened in order to confirm that the delivery had taken place.  (*Id*. at 181:1-15.)  Agent Erwin estimated that it took about twenty seconds to debrief Drengler.  (*Id*. at 181:21-24.)  He then notified Lieutenant Winall that the delivery had been confirmed and reiterated that Beetz was armed with a .45 caliber weapon.  (*Id*. at 181:9-15, 208:21-25.)

During the controlled delivery, Lieutenant Winall had remained in contact with Agent Lawson via cell phone and radio.  (*Id*. at 30:11-31:6, 63:4-6.)  Agent Lawson was not equipped with a device that would allow him to listen to Drengler's wire transmission while he waited at the Justice Center.  (*Id*. at 94:21-97:11.)  His access to information at that time was limited to what he heard over his police radio and from Lieutenant Winall.  (*Id*. at 63:7-64:8.)  According to Agent Lawson, Lieutenant Winall planned to notify him as soon the agents and Drengler completed the controlled delivery so that Agent Lawson could swear to the affidavit and obtain the search warrant.  (*Id*. at 30:24-31:14.)  The officers believed they needed to conduct the search fairly quickly after the delivery in order to ensure that they recover the marijuana prior to Beetz having any opportunity to disseminate it into the community.  (*Id*. at 31:4-6.)  Indeed, Lieutenant Winall testified that right after he received confirmation of the delivery from Agent Erwin, he notified Agent Lawson of the same.  (*Id*. at 64:9-16, 210:17-211:3.)  Lieutenant Winall did not inform Agent Lawson that certain aspects of the controlled delivery had not occurred

precisely as they had initially projected.  (*Id*. at 65:2-13.)  Specifically, Lieutenant Winall never mentioned that Drengler drove directly into the garage and left in the same manner rather than walking to and from the house.  Nor did he inform Agent Lawson that Drengler did not receive any money from Beetz.  As a result, Agent Lawson did not alter his description of the delivery prior to seeking Judge Russell's approval of the Elsinore Avenue warrant.  (*Id*. at 129:8-132:3, 137:9-139:11.)

Believing that the delivery had taken place precisely as planned, Agent Lawson ended his conversation with Lieutenant Winall and asked the clerk at the Justice Center to call Judge Russell again about the second warrant.  (*Id*. at 67:10-15.)  After re-establishing contact with Judge Russell through the beamer, Agent Lawson went through the same process that he had gone through earlier, except this time with regard to the Elsinore Avenue affidavit.  He swore to the truth of and signed the affidavit, faxed it to Judge Russell, and then waited while Judge Russell signed the affidavit and search warrant and faxed the signed copies back to him.  (*Id*. at 67:24-68:5.)  Agent Lawson then alerted the other RENU agents via radio that the warrant and affidavit had been signed at 10:18 p.m.  (*Id*. at 68:6-10.)  Agent Lawson testified at the suppression hearing that he based the time on Judge Russell's time notations on the warrant and affidavit.  (*Id*. at 68:11-69:1; Gov't Ex. 2 at 6, 7.)

Agent Perry's notes also reflect that the Elsinore Avenue warrant was issued at 10:18 p.m. (Def. Ex. I.)  Agent Perry testified that unlike his other notations of times when particular events took place during the delivery, his notation as to the time when the warrant was issued was not based on his observance of his own watch.  Rather, he based that time on the information given by Agent Lawson:

Q.      And then do you recall Agent Lawson broadcasting over your police radio that the search warrant had been signed for 1238 Elsinore?

A.      That's correct.

Q.      Do you recall Agent Lawson stating the time the search warrant was signed?

A.      Yes, he did.

Q.      So what did it – did he broadcast at 10:18 p.m. the search warrant was signed?

A.      Pretty much in that form.  I believe it was, "Search warrant signed, it's 10:18," or, "It's 10:18, the search warrant's signed."

Q.      Okay.  And so you look at paragraph seven in Defendant's Exhibit I.  Do you see number seven under "Details"?

A.      Yes

Q.      Okay.  Now, that time where it says, "At approximately 10:18 p.m.," where did you get that time?

A.      From Steve Lawson.

Q.      Okay.  Not from your watch?

A.      No.

(Tr. 192:4-23.)  Agent Perry further testified that he specifically remembered not checking his own watch when Agent Lawson broadcast that the warrant had been issued, explaining that he did not need to check his watch because Agent Lawson stated the time at which the warrant was issued.  (*Id.* at 194:10-20.)

Once notified that the search warrant had been signed, the RENU SWAT team, who had been parked in a white van just down the street from the target residence, moved in toward the house to execute the warrant.  (*Id.* at 196:1-197:8.)  One of the agents on the SWAT team, Agent

17

Timothy Nash, testified that he had checked his watch upon exiting the SWAT vehicle and noted that the time was 10:20 p.m.[7]  (*Id*. at 196:10-200:19.)  At some point during the search, RENU agents arrested Beetz, and took him to the Cincinnati Police Department ("CPD") criminal investigation section on Broadway for questioning.  (*Id*. at 168:15-25.)  Agent Lawson also responded to the Broadway CPD station.  (*Id*. at 70:1-6.)  Together, he and Agent Ingram interviewed Beetz in a small room that was furnished with a table and three chairs.  (*Id*. at 70:7-8, 71:4-10.)  Both Agent Lawson and Agent Ingram were dressed in plain clothes.  (*Id*. at 71:11-18.)  Beetz was not in handcuffs.[8]  (*Id*. at 71:19-22.)  Agent Lawson described Beetz as appearing shaken up or agitated.  (*Id*. at 72:8-10.)

After introducing themselves to Beetz, Agents Lawson and Ingram explained that they had conducted a narcotics investigated that led to Beetz's arrest and that they wanted to discuss certain matters, such as the identities of his suppliers, with him.  (*Id*. at 72:17-23.)  Agent Ingram gave an advice of rights form to Beetz, and then he explained the form and read it aloud.  (*Id*. at 73:1-3; Gov't Ex. 3.)  After reading the form, Agent Ingram asked Beetz if he wanted to talk.

---

[7] Following the search, Agent Nash drafted a report describing the search and the evidence seized during the search.  (Def. Ex. P.)  In that report, Agent Nash also describes the controlled delivery, stating, "At 10:15 p.m. on August 26, 2009, RENU Agents, with the assistance of the confidential informant, delivered the marijuana to Beetz at his 1238 Elsinore [Avenue] residence."  (Def. Ex. P at 1.)  Agent Nash testified that he had not taken his own notes of the events and that he had likely gotten that information, including the 10:15 p.m. time notation, from Agent Perry, the officer who had been responsible for taking notes during the operation.  (Tr. 200:2-12.)  In fact, Agent Nash stated that the only time that he actually looked at his watch was when he exited the SWAT vehicle to execute the search warrant.  (*Id*. at 200:16-21.)

[8] Agent Lawson testified that Beetz may have been handcuffed upon his arrest, but that he was not handcuffed while in the interview room.  (Tr. 71:19-22.)

(Tr. 75:5-9.)  Beetz responded yes, indicated that he understood the form, and then he signed it.[9]  (*Id*. at 74:5-9, 75:7-9.)  Beetz actually signed the form twice, first at 10:45 p.m. and then a second time at 11:02 p.m. (*Id*. at 74:23-75:1; Gov't Ex. 3.)  After Beetz signed the form the first time, the agents questioned Beetz about the source of the marijuana recovered from the Elsinore Avenue residence.  (Tr. 77:9-12.)  Beetz tried to take control of the interview and shift the focus away from the supplier of the marijuana, wanting instead to talk about another trafficker.  (*Id*. at 77:14-19.)  The agents told Beetz that they wanted to discuss the source of the marijuana first, and as they pushed Beetz on the matter, Beetz continually tried to steer the interview to a different topic.  (*Id*. at 77:19-78:3.)

After a while, Agent Ingram left the room to retrieve drinks – soda or bottled water, and while he was gone, Beetz stated that he wanted to speak with a lawyer.  (*Id*. at 78:3-19.)  At that point, Agent Lawson ended the conversation, informed Beetz that the agents could not speak with him anymore, and then told Agent Ingram that Beetz had invoked his right to counsel.  (*Id*. at 78:16-79:5.)  The agents then began filling out the paperwork they would need in order to have Beetz processed at the Justice Center.  (*Id*. at 79:7-80:11.)  They stayed in the interview room with Beetz while completing the paperwork because there was no where else for them to work in that station.  (*Id*.)  After a few minutes, Beetz tried to initiate conversation again, making statements like, "I know what you guys want.  I have someone I can give you."  (*Id*. at 80:12-

---

[9] The waiver of rights form that Beetz signed asks "[d]o you understand each of these rights I have explained to you," and "[h]aving these rights in mind, do you wish to talk to me now?"  (Tr. 169:15-24.)  The form is signed by Beetz, but does not state whether he answered those questions affirmatively.  (*Id*. at 169:15-170:2.)  Agent Lawson testified that when the waiver was read to Beetz, he verbally indicated that he understood his rights and that he wished to speak with the officers.  (*Id*. at 169:15-170:2, 172:5-25.)

19.)  The agents repeatedly advised Beetz that since he asked for a lawyer, they could not speak to him, but Beetz persisted.  (*Id*. at 80:19-22, 81:15-19.)  Finally, the agents told him that if he wanted to speak to them, they would have to re-advise him of his rights.  (*Id*. at 80:22-25.)

The agents then went over the advice of rights form with Beetz a second time, and at 11:02 p.m., Beetz signed the waiver.  (*Id*. at 81:20-82:25.)  Beetz started talking again, trying to direct the conversation, but the agents told him they would not talk to him if continued to attempt to control the interview.  (*Id*. at 83:3-7.)  Beetz then made a full admission about his drug trafficking practices, his source in California, and the number of times during the past year that he had transported or arranged to have someone else transport marijuana from California to Cincinnati for further distribution.  (*Id*. at 83:7-13.)  After Beetz made those admissions, the agents concluded the interview.  (*Id*. at 83:14-15.)

Sometime later that night, Renu Agents executed the search warrant for the Victory Parkway residence.  (Gov't Ex. 1 at 8.)  Then, the following day, based on information discovered during the searches and the interview of Beetz, Agent Lawson obtained two seizure warrants pertaining to bank and investment accounts held by Beetz.  (Gov't Exs. 4, 5.)

## II.     ANALYSIS

Beetz moves to suppress all evidence seized during the search of the Elsinore Avenue and Victory Parkway residences; any testimony or evidence related to statements Beetz allegedly made to police officers following his arrest; and evidence related to certain Charles Schwab and Chase Bank accounts held by Beetz.  He asserts several grounds for the suppression of the evidence.  First, he challenges the validity of the Victory Parkway and Elsinore Avenue search warrants.  Next, Beetz argues that the statements that he made to Agents Ingram and Lawson

20

constitute fruit of the poisonous tree and were the result of unlawful coercion.  Finally, Beetz also challenges the validity of the seizure warrants for Beetz's investment and bank accounts that were issued the day after the issuance of the search warrants.  Because most of Beetz's asserted grounds for suppression of the evidence depend in part on the validity of the two residential search warrants, the Court begins its analysis there.

### A.     The Residential Search Warrants

#### 1.     Legal Standards Governing the Fourth Amendment Warrant Requirement and the Exclusion of Evidence Obtained in Violation of that Requirement

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  To comply with the Fourth Amendment's protections, an affidavit submitted in support of a search warrant must include sufficient information to allow the judicial officer to find probable cause to justify the search.  *Illinois v. Gates*, 462 U.S. 213, 239 (1983).  Typically, when considering a motion to suppress evidence seized pursuant to a search warrant, the court's review is limited to a consideration of the "four corners" of the affidavit presented to the judicial officer issuing the warrant.  *United States v. Coffee*, 434 F .3d 887, 892 (6th Cir. 2006).  In determining whether an affidavit establishes probable cause,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Gates*, 462 U.S. at 238-39 (internal quotation marks and alterations omitted).  Recognizing that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," the Supreme Court has concluded that courts are to pay "great deference" to a judicial officer's determination of probable cause.  *United States v. Leon*, 468 U.S. 897, 914 (1984).

If the court finds that a search warrant was not issued upon probable cause and that evidence was obtained in violation of the Fourth Amendment, the next question is whether the government should be precluded from using that evidence in a criminal proceeding against the victim of the unconstitutional conduct.  *See Illinois v. Krull*, 480 U.S. 340, 347 (1987).  Recently, the Supreme Court reiterated that the exclusionary rule does not automatically apply to every violation of the Fourth Amendment:

> The [Fourth] Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule – the exclusionary rule – is a prudential doctrine created by this Court to compel respect for the constitutional guaranty.  Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search.  The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations.  Our cases have thus limited the rule's operation to situations in which this purpose is thought most efficaciously served.  Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted.
>
> Real deterrent value is a necessary condition for exclusion, but it is not a sufficient one.  The analysis must also account for the substantial social costs generated by the rule.  Exclusion exacts a heavy toll on both the judicial system and society at large.  It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence.  And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.  Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort.  For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.
>
> Admittedly, there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine.  Expansive dicta in several

22

> decisions suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. . . . In time, however, we came to acknowledge the exclusionary rule for what it undoubtedly is – a judicially created remedy of this Court's own making.  We abandoned the old, reflexive application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits.

*Davis v. United States*, --- S. Ct. ----, 2011 WL 2369583, at *5-6 (June 16, 2011) (internal citations and quotation marks omitted).

Since abandoning the reflexive approach to the exclusion of evidence, the Supreme Court, in a line of cases beginning with *Leon*, 468 U.S. at 909, 911, shifted the focus of its inquiry to the "flagrancy of the police misconduct" at issue.  *See also Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 701 (2009).  With that focus in mind in *Leon*, the Supreme Court held that the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  *Leon*, 468 U.S. at 905; *see also Davis*, 2011 WL 2369583, at *6.

Courts have applied the "good-faith" exception to the exclusionary rule across a range of cases.  *See Davis*, 2011 WL 2369583, at *7 (discussing examples of such cases).  Courts have also identified situations where the good faith reliance exception does not apply and evidence may be excluded.  *See Leon*, 468 U.S. at 914-15, 922-23.  Indeed, in discussing the good faith exception in *Leon*, the Supreme Court identified the following four exceptions to the good faith exception as examples of when courts should apply the exclusionary rule: (1) where the "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the "issuing magistrate wholly abandoned his judicial role" and failed to act in a neutral and detached manor; (3) where the warrant is "based on an affidavit so lacking in indicia

23

of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid."  *Id*. at 923 (internal quotations omitted); *see also United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998); *United States v. Leake*, 998 F.2d 1359, 1366 (6th Cir. 1993).

As discussed in greater detail below, Beetz argues that the evidence seized during the execution of the Elsinore Avenue and Victory Parkway warrants should be excluded because the warrants are based on knowingly or recklessly false statements, the judge issuing the warrants acted as a "rubber stamp" for the police, and the affidavits do not provide a substantial basis from which the judge could find probable cause.  The Court addresses each warrant separately, beginning with the Elsinore Avenue warrant – the target of the majority of Beetz's criticism.

### 2. The Elsinore Avenue Affidavit

#### a. The Elsinore Affidavit Establishes Probable Cause to Support the Search Warrant

Beetz alleges several deficiencies in the affidavit, most of which relate to the description of the controlled delivery.  The first two involve the statements that Beetz paid Drengler upon delivery of the marijuana and that after the controlled delivery, Beetz walked a short distance down the street to meet with RENU agents.  The Government acknowledges that the exchange of currency never took place and that Drengler drove rather than walked away from the residence to the rendezvous point with RENU.  The Court therefore strikes those misstatements before proceeding with the analysis.  After striking that information from the affidavit, the description of the controlled delivery would appear as follows:

24

During the evening hours August 26th, 2009, additional conversations were monitored and recorded between BEETZ and RCI09-44 discussing the delivery of the marijuana at 1238 Elsinore Avenue. It was agreed by both parties that RCI09-44 would deliver the marijuana to BEETZ inside of the residence.

While under RENU surveillance and equipped with audio recording and monitoring devices, RCI09-44 entered 1238 Elsinore in possession of the marijuana. While inside the residence, BEETZ took possession of the marijuana from RCI09-44. ~~BEETZ provided RCI09-44 with the previously agreed upon U.S. Currency for completing the delivery.~~ Upon completion of the transaction, RCI09-44 exited the residence under surveillance ~~walked a short distance~~ before meeting with [a] RENU Agent~~s~~.

(Gov't Ex. 2 at 5.)

Beetz also argues that the Court should strike from the above excerpt the statement that Beetz took possession of the marijuana and Agent Lawson's assertion elsewhere in the affidavit that he had probable cause to believe marijuana would be found in the residence. Beetz bases this argument on his version of the timeline of the delivery and the execution of the warrant. Specifically, Beetz claims that none of the agents had probable cause to believe that the delivery occurred because there is no possible way they could have searched the car to confirm delivery after Drengler left the residence and before Lieutenant Winall advised Agent Lawson that the delivery was complete. Accordingly, Beetz argues that Lieutenant Winall's sworn testimony that he did not tell Agent Lawson that the delivery was complete until after he received confirmation of the delivery from Agent Erwin was untruthful. Instead, Beetz alleges, the only logical way that Judge Russell could have signed the warrant at 10:18 p.m. was if Lieutenant Winall "jumped the gun, and prematurely advised Agent Lawson to submit his fictional affidavit for warrant to Judge Russell before the 'controlled delivery' of marijuana had been confirmed." (Doc. 50 at 603.)

25

The precise timeline of the events that occurred during the controlled delivery and the signing and execution of the Elsinore Avenue warrant is unclear.  There were a number of people involved in the operation, several of whom noted the times of different events based on different watches, clocks, or other time-keeping devices that were not synchronized.  The timeline that emerges from the testimony and notes of those individuals is as follows:

- 8:11 p.m. – The recording device was activated (time based on Agent Perry's watch).

- 8:14 p.m. – Drengler pulled onto Elsinore Avenue (time based on Agent Perry's watch).

- 8:15 p.m. – Drengler entered the garage of the target residence (time based on Agent Perry's watch).

- 8:18 p.m. – The Elsinore Avenue warrant was signed (time based on Judge Russell's clock).

- 8:20 p.m. – The Elsinore Avenue warrant was executed (time based on Agent Nash's watch).

For that timeline to be correct, it would mean that less than three minutes elapsed between the time that Drengler pulled into the garage and the point when Judge Russell signed the warrant and faxed it back to Agent Lawson.  Defendant presents evidence, specifically the audio recording from the controlled delivery, to show that that would not have been possible unless Lieutenant Winall prematurely advised Agent Lawson of the completion of the controlled delivery.  Indeed, the audio recording shows that approximately five minutes and sixteen seconds elapsed between the time when Drengler entered the house and the recording device was

26

turned off.  (*See* Def. Ex. U.)  Based on Agent Erwin's testimony, it then took him another thirty seconds to search the vehicle and debrief Drengler before confirming the delivery to Lieutenant Winall.  Then, according to Agent Lawson's testimony, it would have taken anywhere from one to a  few additional minutes to attest to the truth of his warrant affidavit and get a signed warrant from Judge Russell, depending on how much time it took to actually fax the documents.  In total, the evidence shows that, if Lieutenant Winall's testimony is to be believed, approximately eight to nine minutes would have had to have elapsed between the time Drengler drove into the garage of the residence and the point when the warrant was issued.

There are two possible explanations for the discrepancy between the evidence and the times noted for particular events.  The first explanation is the one posited by Beetz – that Lieutenant Winall gave false testimony and that he did not in fact wait for confirmation of the delivery of the marijuana prior to advising Agent Lawson to obtain the warrant.  The other possible explanation is that the timeline described above, which is based on the notes of three different people looking at three different time-keeping devices simply is not a precise or accurate reflection of the times when the events actually occurred.

The Court finds the second explanation to be the most logical and therefore the most persuasive of the two.  There is no evidence that the time-keeping devices relied upon by Agent Perry, Judge Russell, or Agent Nash were synchronized.  It is entirely possible that the times displayed on each devises deviated from each other by one or more minutes.  Additionally, there is no evidence other than the discrepancy in the timeline that calls into question the truth of Lieutenant Winall's testimony.  During the suppression hearing, Lieutenant Winall repeatedly stated that he was sure he had waited for confirmation from Agent Erwin before notifying Agent

Lawson of the completion of the controlled delivery.  (Tr. 211:11-18, 212:16-213:2.)  The Court

finds that testimony credible, and as a result, the Court finds no basis for striking from the

affidavit Agent Lawson's assertion that Drengler delivered the marijuana to Beetz or that he had

probable cause to believe that marijuana would be located in the residence.

Having stricken only the two statements the Government concede were false, the Court

finds that the remaining portions of the affidavit provides a substantial basis for a finding of

probable cause.  The affidavit describes the capture of Drengler and his admission that he was

transporting marijuana from California to Cincinnati for Beetz and that he previously had acted

as a courier in a similar capacity for Beetz on numerous occasions.  The affidavit also describes

additional information obtained from Drengler indicating that Beetz was at that time engaged in

the distribution of marijuana throughout the Cincinnati area.  RENU agents were able to

corroborate portions of that information through a series of monitored phone calls,[10] surveillance

of the residence to be searched, independent investigation of public records showing a

connection between Beetz and the place to be searched, and ultimately through the controlled

delivery of the marijuana to Beetz at the Elsinore Avenue residence, all of which is noted in the

affidavit.[11]  Although the controlled delivery did not occur precisely as described, the differences

---

[10] In his motion to suppress, Beetz argues that Agent Lawson's description in the affidavit of the monitored phone calls is misleading.  (*See* Doc. 29 at 226.)  However, Beetz never submitted the audio recordings of the phone calls into evidence and did not pursue that argument at the suppression hearing.  Accordingly, there is no evidence that Agent Lawson misrepresented anything that was stated during those phone calls.

[11] Beetz argues that Drengler was an unreliable informant because he had originally denied knowledge of the fact that his suitcase contained marijuana when talking with the officers in Reno, Nevada.  The Court does not find Drengler's original denial of knowledge to be so material that the omission of that fact from the affidavit amounts to a fatal flaw.  RENU agents ultimately were able to corroborate sufficient portions of the information they received from Drengler to demonstrate that he was a credible informant.

between what actually happened and what was described do not materially alter the importance of that information.  The affidavit nonetheless outlines the successful controlled delivery of the marijuana to Beetz at the Elsinore Avenue residence.  The affidavit therefore demonstrates a fair probability that contraband, specifically marijuana, would be found in the residence.

That leads the Court to Beetz's final argument relating to probable cause, which is that agent Lawson had no reason to believe that the long list of other items described in the affidavit would be found in the residence.  That list includes scales or weighing devices, packaging materials such as food saver sealing bags, United States currency, electronic devices, furs, financial records, books documenting financial activity associated with the sale of contraband, and weapons.  Beetz argues Agent Lawson had no reason to believe any of those items would be found in the residence because the only information he was given about the residence was that although Beetz had access to and ultimately planned to occupy the residence, he still had not moved any furnishings or possessions into the residence as of a few days prior to the controlled delivery.  Agent Lawson disclosed those facts in the affidavit.   There are, however, additional facts not pointed to by Beetz that support Agent Lawson's belief that the listed items would be found.  That information includes the following:

- Drengler told RENU agents that he had seen numerous firearms, ballistic body armor, large amounts of U.S. currency, and a safe at Beetz's Victory Parkway residence, the residence from which Beetz was planning to move, demonstrating at the least that Beetz had possession of those items sometime in the recent past;

- Beetz was having the Elsinore Avenue residence wired for surround sound, suggesting he planned to move audio/visual equipment into the residence;

- RENU agents observed a car registered to Beetz parked outside of the Elsinore Avenue residence on August 26, 2009, suggesting that Beetz was spending time at the new residence;

- Beetz chose that residence as the location for the delivery of the marijuana;

- The marijuana that Drengler was transporting was packed in sealed food saver bags, a type of packaging known to Agent Lawson commonly to be used by narcotics traffickers to package and transport marijuana;

- Agent Lawson's knowledge that traffickers commonly use other tools to aid in packaging the marijuana, such as a machine that creates a virtually air tight seal; and

- Agent Lawson knowledge, based on his approximately ten years of experience with narcotics investigations, that the items described in the affidavit are commonly associated with drug trafficking.

Reviewing the totality of the evidence described in the affidavit, the Court finds that there is a sufficient nexus between the Elsinore Avenue residence and the alleged criminal activity to give rise to probable cause that items in addition to marijuana would be found in the residence.   Agent Lawson knew that Beetz was planning to move into the residence, had selected that residence as the location for Drengler to drop off the marijuana, and had parked his car outside of the residence.  From that information, one could conclude that there existed a fair probability that Beetz or someone hired by Beetz may have moved some personal items, including the items described above, into the residence by the time of the controlled delivery, or

that Beetz may have brought such items with him for purposes of handling the marijuana after the delivery.

### b.        Good Faith Exception to Exclusionary Rule

The Court alternatively finds that even if the affidavit does not establish probable cause to search 1238 Elsinore Avenue for all of the items listed in the search warrant request, the Court would deny Beetz's motion under the *Leon* good faith standard.  Beetz argues that the officers in this case did not act in good faith.  He claims instead that all four of the circumstances – or exceptions to the exception – identified in *Leon* as examples of when a court should not apply the good faith exception are present.  For the reasons stated below, the Court finds otherwise.

The Court quickly dispenses of Beetz's arguments as to the second and fourth exceptions described in *Leon*.  First, there is no evidence that Judge Russell wholly abandoned her judicial role and failed to act in a neutral and detached manor.  Second, the warrant is not so facially deficient that the executing officers could not reasonably presume it to be valid.  Rather, the warrant described with particularity the residence to be searched and the items to be seized.

Beetz's arguments as to the first and third exceptions require greater analysis.  The first exception – the knowing or reckless inclusion of false information in the warrant affidavit – is based primarily on *Franks v. Delaware*, 438 U.S. 154 (1978).  *See Leon*, 468 U.S. at 914.  Under *Franks*, a party may challenge the veracity of a search warrant affidavit upon a substantial preliminary showing that a false statement was included knowingly and intentionally or with reckless disregard for its truth and that the allegedly false statement was necessary for a finding of probable cause.  *See United States v. Stuart*, 507 F.3d 391, 396 (6th Cir. 2007) (construing *Franks*).  In *Leon*, the Supreme Court clarified that the good faith standard would not protect

31

evidence from exclusion where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923.  In this case, there is no evidence that Agent Lawson knowingly or recklessly included any materially false information in the affidavit.  Nor is there any evidence that any of the Agents feeding information to Agent Lawson knowingly or recklessly gave him false information.  Instead, the evidence shows that while under pressure to quickly investigate Drengler's claims, conduct the controlled delivery at the time that Beetz expected the delivery to occur, and then recover the marijuana before Beetz's had an opportunity to further distribute it, the agents negligently included some false information in the affidavit.  That information was not material to a finding of probable cause, as discussed above, and mere negligence does not preclude application of the good faith exception to the exclusionary rule.

The fourth circumstance identified by the Supreme Court as an exception to the good faith exception has often been referred to as the "bare bones affidavit" phenomenon.  *United States v. McPhearson*, 469 F.3d 518, 525-26 (6th Cir. 2006).  "A bare bones affidavit is one that merely states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id*. at 526.  The basis for the bare bones affidavit exception is that there can be no claim of good faith reliance on the warrant where the affidavit is so lacking in indicia of probable cause as to render belief in its existence objectively unreasonable.  In making the "objective reasonableness determination," the Court "does not examine the subjective states of mind of [the] law enforcement officers" involved in the challenged search, "rather it inquires 'whether a reasonably well trained officer

would have known that the search was illegal despite the magistrate's decision.'" *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (quoting *Leon*, 468 U.S. at 923 n. 23).  As shown above, the Elsinore Avenue affidavit does not merely consist of suspicions and unsupported conclusions.  Agent Lawson set forth in detail the basis for his belief that probable cause existed to search the residence for contraband and other related items.  This Court has already concluded that that belief was reasonable and that the affidavit does in fact establish probable cause.  However, even if this Court had determined that the affidavit falls shy of demonstrating probable cause, the Court could not conclude that it is so bare bones as to render inappropriate a claim of good faith reliance.  The Court therefore finds no basis to exclude the evidence seized during the execution of the Elsinore Avenue warrant.

### 3. The Victory Parkway Affidavit

Beetz's challenge to the validity of the Victory Parkway warrant is in large part similar to his challenge to the Elsinore Avenue warrant.  He argues that the affidavit in support of the warrant does not establish probable cause to believe that Beetz was involved in any illegal activity or to connect the residence to the alleged illegal activity.  Beetz points out that Drengler did not give RENU agents any information about Beetz storing marijuana at the Victory Parkway residence.  Although Drengler told the agents that he had visited Beetz at that residence approximately ten times during the two-year period prior to his arrest, and that he had seen firearms, body armor, currency, and a safe during those visits, he did not mention ever having seen marijuana in the apartment.  Nor did he claim to have previously delivered any marijuana to that location.

Because the affidavit submitted in support of the Victory Parkway warrant does not contain a description of the controlled delivery, there is somewhat less of a basis to support probable cause than was articulated in the Elsinore Avenue affidavit.  Nonetheless, the Court finds the Victory Parkway affidavit contains sufficient information, described above in great detail, from which a judge could find probable cause to believe that Beetz was engaged in the illegal trafficking of marijuana and that certain items commonly associated with that activity, such as weapons and U.S. currency, would be found at the residence.

The more difficult question is whether the affidavit establishes a fair probability that marijuana would be located at 2200 Victory Parkway.  However, the Court need not answer that question herein because even if the affidavit falls short of establishing probable cause to search for marijuana, exclusion of the evidence seized during the search of the Victory Parkway residence would not serve the purpose of the exclusionary rule.  In conducting that search, RENU agents operated in reasonable, good faith reliance on the Victory Parkway warrant. Therefore, exclusion of the evidence would have little deterrent effect.  Although Beetz argues otherwise, the Court finds no reason not to apply the good faith exception in this case.  Just as the Court concluded with regard to the Elsinore Avenue warrant, the Court finds no evidence that the affidavit submitted in support of the Victory Parkway warrant contained any statements made with reckless or knowing disregard to the falsity of the matter asserted, that Judge Russell abandoned her judicial role and failed to act in a neutral or detached manner, or that the warrant was so facially deficient that no officer could presume its validity.

As to the final proposed reason for denying application of the good faith exception, the Court concludes also that the affidavit is not so lacking in indicia of probable cause as to render

belief in its existence objectively unreasonable.  The Sixth Circuit often has applied the good

faith exception in cases where the search warrant failed to demonstrate a sufficient nexus

between the search location and the alleged criminal activity, but did articulate "some modicum

of evidence, however slight, to connect the criminal activity described in the affidavit to the

place to be searched."  *United States v. Laughton*, 409 F.3d 744, 749 (6th Cir. 2005); *compare*

*United States v. Washington*, 380 F.3d 236, 242-43 (6th Cir. 2004) (holding that an application

for a warrant to search a residence for documents and records related to drug trafficking activity

"clearly" passed the "so lacking in indicia of probable cause" test with regard to establishing a

nexus between criminal activity and the place to be searched where the affidavit stated that: an

unidentified person who had twice been observed participating in controlled buys had been

driving a car that was registered to the target residence; officers had seen the car parked outside

of the residence; and officers had on one occasion observed the unidentified individual emerge

from the residence and get a ride to a garage where he picked up the same car), *and United*

*States v. Carpenter*, 360 F.3d 591, 593, 596 (6th Cir. 2004) (holding that a residential search

warrant affidavit stating that a field of marijuana plants was growing nearby the house and that

there was a road connecting the house to the field did not establish probable cause to search the

house, but was not so lacking in facts connecting the residence to the marijuana field as to

preclude application of the good faith standard), *with Laughton*, 409 F.3d at 748-51 (declining to

apply good faith exception where the search warrant application simply listed the address of the

premises to be searched, gave a summary of the officer's experience, and described the

defendant's alleged involvement in narcotics trafficking, but did not describe the connection

existed, if any, between the defendant and the residence or the illegal activity and the residence),

*and Helton*, 314 F.3d at 824-25 (good faith exception did not apply where the information included in the search warrant application was limited to a description of the target residence, evidence that someone in the target residence made approximately three phone calls per month to known drug dealers, an allegation that a drug dealer stores proceeds with two individuals (neither of whom lived at the house), and the uncorroborated allegations of an anonymous informant suggesting that drug money was stored in the house).  Additionally, the Sixth Circuit has held that a warrant "issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking."  *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

To the extent that the affidavit in this case does not actually establish probable cause to search the Victory Parkway residence for marijuana, it is at least sufficient to overcome a bare bones characterization.  The affidavit includes information obtained from Drengler that Beetz had been involved in the sale of marijuana for a number of years, that Beetz lived at the Victory Parkway address, and that Drengler had observed items believed to be associated with the sale of marijuana by Beetz.  As discussed above, the affidavit describes additional corroborating evidence that demonstrates Drengler's credibility.  Those facts establish at least some connection between the alleged criminal activity and the Victory Parkway residence.  *See Laughton*, 409 F.3d at 750 (noting that in cases applying the good faith standard, the reviewing courts were "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been, between the criminal activity at issue and the place to be searched" (emphasis in original)).  Therefore, just as with the search of the Elsinore Avenue residence, the Court denies

Beetz motion to suppress the evidence seized during the search of his Victory Parkway residence.

### B.    Post-Arrest Statements

In addition to challenging the searches of his residences, Beetz also moves to suppress all statements he allegedly made to RENU agents following his arrest.  Beetz argues that those statements were unlawfully coerced through continued questioning after he invoked his right to counsel.[12]

The Supreme Court has held that once a suspect invokes his right to counsel, "the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  *Miranda*, 384 U.S. at 475.

In *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  However, if "the accused himself initiates further communication, exchanges, or conversations with the police," an invocation of the right to counsel can be waived and officers may resume questioning

---

[12]  Beetz also argues that those statements constitute "fruit of the poisonous tree" because he only made them after being arrested as a result of the allegedly unlawful search of the Elsinore Avenue residence.  The Court's finding that the Elsinore Avenue warrant was valid moots that argument.

the suspect.  *Id*. at 484-85; *see also Wyrick v. Fields*, 459 U.S. 42, 45-46 (1982).  In order to be valid, the waiver much be "knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities."  *Edwards*, 451 U.S. at 486.  The burden of proof as to waiver remains with the prosecution.  *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).

Interpreting Supreme Court precedent, the Sixth Circuit has clarified that not all communication constitutes as "initiation" under *Edwards*.  Instead, in order for the defendant's initiation of further communication to be viewed as a waiver of Miranda rights, the defendant's communication must occur "without influence by the authorities" and must demonstrate a "willingness and a desire to talk generally about his case."  *United States v. Whaley*, 13 F.3d 963, 966-67 (6th Cir. 1994).  For example, in *United States v. Soto*, the Sixth Circuit found that a suspect's request that his belongings not be mixed up with those of a co-defendant did not open the door to further questioning, because the remark pertained only to how "inventory should be conducted" and did not evince a desire to resume a discussion about the suspect's case.  953 F.2d 263, 265 (6th Cir. 1992).  In contrast, in *United States v. Holmes*, the Sixth Circuit held that a defendant initiated further communication and thus waived his earlier invocation of the right to counsel, where the defendant made persistent requests to speak to an officer and stated that he would cooperate if the officer could assist in returning the car that he had been driving at the time of his arrest to his girlfriend.  225 F.3d 660, 2000 WL 1033046, at *2 (6th Cir. July 19, 2000.)

Beetz argues that his statements were coerced because the RENU agents failed to properly advise him of his rights and continued to question him despite his repeated request for

counsel.  However, the testimony elicited during the suppression hearing shows that Agents Lawson and Ingram advised Beetz of his rights, ensured that Beetz understood those rights, and obtained a signed waiver form from Beetz prior to asking him any questions pertaining to their investigation.  They then stopped the conversation as soon as Beetz requested an attorney and made no attempt to question Beetz again until after he initiated further communication.

There is no evidence in the record that the agents resorted to any physical pressure, coercion, or deception to elicit Beetz's statements.  There also is no evidence that when Beetz initiated a conversation with the police after invoking his right to counsel he did so as a result of any prompting on the part of RENU agents.  Rather, the evidence shows that although Beetz persisted in trying to talk to the agents, stating that he knew what they wanted and that he had information to give them, the agents refused to engage in any conversation with Beetz until after they advised him of his rights and obtained a second signature on the original waiver form indicating that he had agreed to waive his rights a second time.  Beetz statements and conduct evinced a willingness and a desire to engage in a general discussion about the agents' investigation, and the totality of the circumstances indicates that Beetz knowingly and intentionally waived his *Miranda* rights.  Accordingly, the Court denies Beetz's motion to suppress his post-arrest statements.

### C.    The Seizure Warrants

The last category of evidence addressed by Beetz in his motion to suppress is the evidence seized pursuant to two seizure warrants issued for Beetz's investment and bank accounts.  Beetz argues that those warrants were obtained based on information gathered during the search of his residences and therefore constitute "fruit of the poisonous tree."  Because the

39

Court has already determined that the searches of his residences were valid and that there is no basis to exclude evidence seized during those searches, the Court also denies Beetz's motion to suppress evidence seized pursuant to the seizure warrants.

## III.    CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant Beetz's Motion to Suppress Evidence.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court